1

DORSEY & WHITNEY LLP
J. Michael Keyes (SBN 262281)

2

 *keyes.mike@dorsey.com*
Connor J. Hansen (*pro hac vice*)

3

 *hansen.connor@dorsey.com*
701 Fifth Avenue, Suite 6100

4

Seattle, WA 98104
Telephone: 206.903.8800

5

Facsimile:  206.903.8820

6

DORSEY & WHITNEY LLP
Kent J. Schmidt (SBN 195969)

7

 *schmidt.kent@dorsey.com*
600 Anton Boulevard, Suite 200

8

Costa Mesa, CA 92626
Telephone:  714.800.1400

9

Facsimile:  714.800.1499

10

*Attorneys for Plaintiff AXS Group LLC*

11

12

**UNITED STATES DISTRICT COURT**

13

**CENTRAL DISTRICT OF CALIFORNIA,**

14

15

AXS GROUP LLC,

16

     Plaintiff,

17

v.

18

INTERNET REFERRAL SERVICES, LLC, EVENT TICKETS CENTER, INC., VERIFIED-TICKET.COM, AMOSA.APP and SECURE.TICKETS,

19

20

     Defendants.

21

22

23

24

25

26

27

28

Case No. 2:24−CV−00377 CAS (EX)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (REDACTED)**

Filed concurrently with:
1) Notice of Motion and Motion for Preliminary Injunction;
2) Declaration of Alex Hazboun in Support of Plaintiff's Motion for Preliminary Injunction; and
3) [Proposed] Order Granting Plaintiff's Motion for Preliminary Injunction

Honorable Christina A. Snyder

Date:  February 26, 2024
Time:  10:00 am
Courtroom:  8D

Complaint filed:  January 16, 2024

# **TABLE OF CONTENTS**

I.   Introduction & Summary of Relief Requested ................................................. 1

II.  Statement Of Facts In Support Of Injunctive Relief ...................................... 1

    A.   Plaintiff and Its AXS Digital Ticket Platform ........................................ 1

    B.   AXS Mobile ID (Formerly Known as "Flash Seats") ............................. 2

    C.   Plaintiff's Copyrights and Trademarks .................................................... 4

    D.   Defendants and Their Counterfeit Digital Tickets ................................... 5

    E.   Additional Acts of Infringement by IRS and ETC .................................. 8

III.   Law & Argument ......................................................................................... 9

    A.   The Court Has Personal Jurisdiction Over Defendants ........................... 9

    B.   AXS Is Entitled to a Preliminary Injunction .......................................... 9

        1.   AXS Is Likely to Succeed on Its Claims That Defendants Are Infringing Its Copyrights ................................................................. 9

            a.   AXS Owns Valid Copyrights to the AXS App ........................ 10

            b.   Defendants Have Copied Protected Elements of AXS's Works ...................................................................................... 10

            c.   The Court Can and Should Infer Access Because the Infringing Works Are "Strikingly Similar" to Plaintiff's Works ...................................................................................... 10

            d.   Defendants Had the Opportunity to Copy Plaintiff's Work. ..................................................................................... 11

        2.   AXS Is Likely to Succeed on Its Claims That Defendants Are Infringing AXS's Trademarks and Engaging in Unfair Competition .................................................................................... 12

            a.   AXS Owns Valid and Enforceable AXS Registrations .......... 12

            b.   AXS Owns Common Law Rights in the "AXS Mobile ID" and "Flash Seats" Marks ........................................................ 13

            c.   Consumers Are Likely to Be Confused by Defendants' Improper and Unauthorized Use of the AXS Marks ............... 14

                (i)   Defendants Use of Counterfeit Marks Is Inherently Confusing ................................................................ 14

                (ii)   *Sleekcraft* Factor 1:  The AXS Marks Are Inherently and Commercially Strong ................................. 15

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Case No. 2:24−cv−00377 CAS (Ex)

(iii)  *Sleekcraft* Factor 2:  The Parties' Digital Tickets Are Identical ........................................................................ 16

(iv)  *Sleekcraft* Factor 3:  Defendants Are Using Exact Replicas of Plaintiff's AXS Marks ................................ 16

(v)  *Sleekcraft* Factor 4:  Consumers Have Been Confused by Defendants' Counterfeit Tickets ................ 17

(vi)  *Sleekcraft* Factor 5:  The Parties Use the Same Marketing Channels and Market Their Services to the Same Consumers .......................................................... 17

(vii)  *Sleekcraft* Factor 6:  The Parties' Consumers Are the General Public Who Attend Events ................................ 18

(viii)  *Sleekcraft* Factor 7:  Defendants' Intent to Confuse Can Be Inferred ........................................................... 18

(ix)  *Sleekcraft* Factor 8:  The Parties Already Compete in the Same Market ........................................................... 19

3.  AXS Will Suffer Irreparable Harm in the Absence of an Injunction for Which There Is No Adequate Remedy at Law ........ 19

4.  The Public Interest Is Served by an Injunction .............................. 20

5.  The Balance of the Equities Favors an Injunction .......................... 20

IV.  Bond .................................................................................................. 21

V.  Conclusion .......................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*AK Futures LLC v. Boyd St. Disco*,
    No. 8:21-cv-01027-JVS-ADSx, 2021 U.S. Dist. LEXIS 189084
    (C.D. Cal. Aug. 4, 2021) ..................................................................... 14

*Am. Int'l Grp. v. Am. Int'l Bank*,
    926 F.2d 829 (9th Cir. 1991) ............................................................... 15

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979) ................................................... 14, 15, 16

*Applied Info Scis. Corp. v. eBay, Inc.*,
    511 F.3d 966 (9th Cir. 2007) ............................................................... 12

*Arcona, Inc. v. Farmacy Beauty, Ltd. Liab. Co.*,
    976 F.3d 1074 (9th Cir. 2020) ............................................................. 15

*Bridgestone Brands, LLC v. Dastgah*,
    No. 16-cv-00906-BLF, 2016 U.S. Dist. LEXIS 35557
    (N.D. Cal. Mar. 18, 2016) ................................................................... 21

*Brookfield Commc'ns Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ....................................................*passim*

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
    158 F.3d 1002 (9th Cir. 1998) ............................................................. 13

*Disney Enters., Inc. v. VidAngel, Inc.*,
    224 F. Supp. 3d 957 (C.D. Cal. 2016) ................................................. 20

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
    356 F.3d 1256 (10th Cir. 2004) ........................................................... 20

*Entrepreneur Media v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) ............................................................. 16

*Filipino Yellow Pages, Inc. v. Asian J. Pubs., Inc.*,
    198 F.3d 1143 (9th Cir. 1999) ............................................................. 13

*Global Tobacco, LLC v. R.K. Co.*,
    No. CV 15-05227-RGK, 2015 U.S. Dist. LEXIS 190441
    (C.D. Cal. Sept. 24, 2015) ................................................................... 15

MEMORANDUM IN SUPPORT OF                          Case No. 2:24−cv−00377 CAS (Ex)
MOTION FOR PRELIMINARY INJUNCTION

*Glow Indus. v. Lopez*,
   252 F. Supp. 2d 962 (C.D. Cal. 2002) ................................................................. 13

*GoTo.com Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ............................................................................ 18

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,
   287 F.3d 866 (9th Cir. 2002) .............................................................................. 13

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) ............................................................................ 21

*Jorgensen v. Cassiday*,
   320 F.3d 906 (9th Cir. 2003) .............................................................................. 21

*Kelly Tracht, LLC v. Dazzle Up, LLC*,
   No. 17-80434-CIV-MARRA, 2017 U.S. Dist. LEXIS 172004
   (S.D. Fl. Oct. 18, 2017) ..................................................................................... 12

*Keracell, Inc. v. Aesthetically Correct, LLC*,
   No. 18-1793 AG, 2018 U.S. Dist. LEXIS 223339
   (C.D. Cal. Dec. 10, 2018) ................................................................................... 17

*Khast v. Wash. Mut. Bank*,
   No. 10-CV-2168-IEG (JMA), 2010 U.S. Dist. LEXIS 113650
   (S.D. Cal. Oct. 26, 2010) .................................................................................... 20

*L.A. Printex Indus. v. Aeropostale, Inc.*,
   676 F.3d 841 (9th Cir. 2012) .............................................................................. 12

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
   762 F.3d 867 (9th Cir. 2014) .............................................................................. 16

*Loomis v. Cornish*,
   836 F.3d 991 (9th Cir. 2016) ........................................................................ 9, 11

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
   922 F.3d 946 (9th Cir. 2019) .............................................................................. 10

*Marketquest Grp., Inc. v. BIC Corp.*,
   862 F.3d 927 (9th Cir. 2017) .............................................................................. 18

-iv-

*Merch. Transaction Sys. v. Nelcela, Inc.*,
  No. CV 02-1954-PHX-MHM, 2009 U.S. Dist. LEXIS 25663
  (D. Az. Mar. 17, 2009) ...................................................................... 4, 10

*MGM Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) .............................................. 19

*Moement, Inc. v. GrooMore, Inc.*,
  No. 2:22-cv-02871-MWF, 2022 U.S. Dist. LEXIS 216330
  (C.D. Cal. Nov. 29, 2022) ................................................................. 4, 10

*Motul S.A. v. USA Wholesale Lubricant, Inc.*,
  No. 4:22-cv-04841-JSW, 2023 U.S. Dist. LEXIS 138282
  (N.D. Cal. Aug. 8, 2023) ...................................................................... 13

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) ................................................... 15, 16, 19

*Off. Airline Guides, Inc. v. Goss*,
  6 F.3d 1385 (9th Cir. 1993) ............................................................ 18, 19

*Playboy Enters. v. Netscape Commc'ns Corp.*,
  354 F.3d 1020 (9th Cir. 2004) ............................................................. 18

*Pom Wonderful Ltd. Liab. Co. v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) ............................................................. 17

*Rearden LLC v. Rearden Com., Inc.*,
  683 F.3d 1190 (9th Cir. 2012) ............................................................. 14

*Rearden, LLC v. Rearden Com. Inc.*,
  597 F. Supp. 2d 1006 (N.D. Cal. 2009) .............................................. 18

*Samick Music Corp. v. Gordon*,
  No. SACV 20-395-GW-JDEx, 2020 U.S. Dist. LEXIS 106485
  (C.D. Cal. Mar. 26, 2020) ..................................................................... 21

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) ............................................................. 11

*Stewart v. Wachowski*,
  574 F. Supp. 2d 1074 (C.D. Cal. 2005) .............................................. 10

*Synoptek, LLC v. Synaptek Corp.*,
   309 F. Supp. 825 (C.D. Cal. 2018) ....................................................... 17

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000) .............................................................. 11

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) .............................................................. 20

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
   No. C 12-2582 CW, 2012 U.S. Dist. LEXIS 85665
   (N.D. Cal. June 20, 2012) ................................................................... 14

*Unicolors, Inc. v. Urban Outfitters*,
   853 F.3d 980 (9th Cir. 2017) .............................................................. 10

*Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*,
   515 F. Supp. 3d 1061 (N.D. Cal. 2021) ............................................... 19

*WeRide Corp. v. Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019)................................................. 20

*Wetzel's Pretzels, LLC v. Johnson*,
   797 F. Supp. 2d 1020 (C.D. Cal. 2011)................................................ 20

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 9

**Statutes**

15 U.S.C. § 1114............................................................................................ 12

15 U.S.C. § 1115(b) ....................................................................................... 13

15 U.S.C. § 1116 (a) ...................................................................................... 19

15 U.S.C. § 1125............................................................................................ 12

17 U.S.C. § 410(c) ......................................................................................... 10

**Other Authorities**

H.R. REP. No. 116-645 (2020) ...................................................................... 19

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Case No. 2:24−cv−00377 CAS (Ex)

## I.    INTRODUCTION & SUMMARY OF RELIEF REQUESTED

Plaintiff AXS Group LLC ("AXS") seeks injunctive relief against Internet Referral Services LLC ("IRS"), Event Tickets Center, Inc. ("ETC"), Verified-Ticket.com ("Verified-Ticket"), Amosa.app ("Amosa"), and Secure.Tickets.  As set forth herein, these Defendants and their confederates are engaged in widespread, illicit acts of willful infringement and counterfeiting in violation of AXS's valuable intellectual property rights.  This conduct is severely harming AXS's goodwill and reputation.  The public is also being duped into purchasing phony electronic tickets from these Defendants.  And, many entertainment venues are also being adversely impacted by Defendants selling their fake tickets.  The Court should put an immediate stop to these acts and restrain Defendants for the pendency of this action as set forth in Plaintiff's [Proposed] Order Granting Injunctive Relief.

## II.    STATEMENT OF FACTS IN SUPPORT OF INJUNCTIVE RELIEF

### A.    Plaintiff and Its AXS Digital Ticket Platform

Plaintiff provides its proprietary ticketing software and services including through an internet website and mobile application (the "AXS Platform") to hundreds of event organizer clients who present sports and entertainment events in the United States.  Verified Complaint ("Compl.") ¶ 2.  Plaintiff utilizes the AXS Platform to market, sell and distribute tickets on behalf of its event organizer clients, and delivers digital tickets to end user customers who purchased tickets on the AXS Platform using AXS's patented AXS Mobile ID technology.  *Id.*

The AXS Platform includes Plaintiff's website (http://www.axs.com) and the AXS App, which interoperates with the website.  *Id.* ¶ 23.  Plaintiff delivers digital tickets to consumers exclusively through the AXS App.  *Id.* ¶ 2.  The AXS App is available for download from both the Apple App Store (for Apple devices) and Google Play Store (for Android devices).  *Id.* ¶ 23.  The AXS App is wildly popular among consumers; in total, it has been downloaded by ███████████ *Id.*  In the Apple App Store, the AXS App has an average rating of 4.7 out of 5 stars,

-1-

1  with nearly 267,000 ratings as of the time the Complaint was filed. *Id.* In the Google

2  Play Store, the AXS App enjoys a 4.3 star rating from nearly 20,000 reviews. *Id.*

3      AXS uses security and access control measures to prevent misuse of the AXS

4  App, including ███████████████████████████████████████████

5  ████████████████████ *Id.* ¶ 24.

6      Consumers can search for and purchase tickets to various events through the

7  AXS Platform, both online and in the AXS App, in both a primary and secondary

8  (resale) marketplace. *Id.* ¶¶ 3-4, 23. In the "primary market," AXS acts as an agent

9  for venues, promoters and teams that sell live event tickets to their fans. *Id.* ¶ 5.

10  Plaintiff has more than 300 event organizer clients and sells millions of tickets for

11  thousands of events per year in the United States. *Id.* ¶ 25. In the "secondary

12  market," AXS offers its sales platform and ticket delivery services for resellers to sell

13  their tickets to new buyers on the AXS Official Resale marketplace. *Id.* ¶ 5. Whether

14  sold through the primary market or the secondary market, AXS assures consumers

15  that their purchased tickets are "100% authentic tickets." *Id.* ¶ 25. In 2022 alone,

16  AXS generated revenues ███████████████████████████████████

17  *Id.* ¶ 34.

18      **B.    AXS Mobile ID (Formerly Known as "Flash Seats")**

19      AXS is able to provide these assurances because it uses proprietary software

20  AXS engineers developed called "AXS Mobile ID." *Id.* ¶ 28. AXS Mobile ID is an

21  identity-based ticketing technology that assigns a unique identifier to each consumer

22  and a mechanism for associating each digital ticket, to assign and deliver each digital

23  ticket to the proper consumer. *Id.* AXS's genuine digital tickets are always delivered

24  to consumers through the AXS App. *Id.* ¶ 29. To increase security, AXS also

25  developed a proprietary code-rotation algorithm for its digital tickets, which changes

26  the "QR code"[1] on a digital ticket inside the AXS App on a variable duration,

27

28  [1] A QR Code is a "two-dimensional barcode printed as a square pattern of black and white squares that encodes data." *QR Code*, Merriam-Webster,

MEMORANDUM IN SUPPORT OF                          Case No. 2:24−cv−00377 CAS (Ex)
MOTION FOR PRELIMINARY INJUNCTION

1    typically set to every 59 seconds.  *Id.* ¶ 28.  AXS has also implemented security and

2    access control measures to prevent misuse of the AXS App, including ██████

3    ████████████████████████████████████████████████████████████████████

4    ██████████████   Declaration of Alex Hazboun ("Hazboun Decl.") ¶ 6.

5         AXS's digital tickets have a distinctive and original design comprised of,

6    among other things, the phrase "AXS Mobile ID," the rotating QR code, and

7    information about the venue, event, and purchaser contained on the face of the digital

8    ticket.  Compl. ¶ 30.  The default and most common color scheme for AXS digital

9    tickets is a deep, rich purple hue background with a series of AXS watermarks.  *Id.*

10   Below is an example of how a genuine AXS digital ticket appears to consumers

11   within the AXS App:

12
13
14
15   
16
17
18
19
20
21
22

23   *Id.*

24        Since at least September 1, 2020, Plaintiff has promoted AXS Mobile ID to

25   customers and prospective customers to assure them that both the sale and purchase

26   of AXS digital tickets is safe and secure.  *Id.* ¶ 31.  These assurances about AXS

27   ――――――――――――――――――――――

28   https://www.merriam-webster.com/dictionary/QR%20code (last accessed October
     30, 2023).

MEMORANDUM IN SUPPORT OF                          Case No. 2:24−cv−00377 CAS (Ex)
MOTION FOR PRELIMINARY INJUNCTION

Mobile ID are prominently displayed and promoted to consumers and fans. *Id.* They can be found on multiple locations on AXS's website, on the Apple App and Google Play Stores, and several Youtube.com videos. *Id.*; Compl. Exh. D. Further, many of AXS's client websites that operate entertainment venues and professional sports associations in the Los Angeles area and beyond also tout the safety and security of using AXS Mobile ID. Compl. ¶ 32**.** These include, but are not limited to, Crypto.com Arena in Los Angeles, the National Hockey League, The Regency Ballroom in San Francisco, and T-Mobile Arena in Las Vegas. *Id.*

Prior to adopting "AXS Mobile ID," AXS had previously used the trademark "Flash Seats" (dating back to at least April 2006) as the name for the electronic delivery of authentic AXS tickets to consumers. *Id.* ¶ 33. References to "Flash Seats" are still made on axs.com, as well as third-party sites that state things such as "AXS Mobile ID (formerly Flash Seats)." *Id.*; *see also* Compl. Exh. F.

### C.    Plaintiff's Copyrights and Trademarks

To protect its investments in the AXS Platform, Plaintiff has obtained copyright registrations covering both the iOS and Android versions of the AXS App. *Id.* ¶ 44. Copyright Registration No. TX0009296416, which has an effective date of July 26, 2023, relates to the iOS version of the AXS App and Copyright Registration No. TX0009300435, with an effective date of August 15, 2023, relates to the Android version of the AXS App. *Id.* ¶¶ 45-46, Exhs. J & K. Both registrations are for "computer programs" and the deposit copies for both were comprised of, respectively, the iOS and Android source code for the AXS App. *See id.* ¶ 48. Accordingly, copyright protection encompasses both the digital tickets, other "screen displays" and other nonliteral elements of the App as well as the source code itself. *Moement, Inc. v. GrooMore, Inc.*, No. 2:22-cv-02871-MWF (JEMx), 2022 U.S. Dist. LEXIS 216330, at *24 (C.D. Cal. Nov. 29, 2022); *see also Merch. Transaction Sys. v. Nelcela, Inc.*, No. CV 02-1954-PHX-MHM, 2009 U.S. Dist. LEXIS 25663, at *29 (D. Az. Mar. 17, 2009) (computer program copyright protection extends to

"nonliteral elements, including its structure, sequence, organization, user interface, screen displays, and menu structures") (citation omitted).

Plaintiff also has common law rights and has several trademark registrations to protect the AXS Marks (the "AXS Registrations"), which are set forth in detail in the Verified Complaint.  Compl. ¶¶ 40-41.  In addition to the AXS Marks covered by the AXS Registrations, Plaintiff has used "AXS Mobile ID" and "Flash Seats" in connection with the advertising, selling, and distribution of digital tickets, as set forth above.  *Id.* ¶ 42.

### D.    Defendants and Their Counterfeit Digital Tickets

Defendants collectively operate online retail platforms and/or ticket delivery services listing, selling and delivering secondary market tickets listed by ticket resellers or brokers on third party secondary market ticket sales websites.  *Id.* ¶ 7. Through these platforms they have marketed, distributed, sold, displayed, and delivered digital tickets to consumers that are nearly indistinguishable from Plaintiff's genuine AXS tickets ("Counterfeit Tickets").  *Id.*

Defendants IRS and ETC operate ticket retail platforms, respectively tickets-center.com and eventticketscenter.com, through which Counterfeit Tickets are marketed and sold to consumers.  *Id.* ¶ 56.  Both IRS's and ETC's websites include listings for hundreds, if not thousands, of tickets to various events in the Los Angeles area.  *See id.* ¶¶ 54-55.  On many occasions, consumers have purchased Counterfeit Tickets or have otherwise been swindled by IRS, thereby sparking thousands of negative reviews online calling the website a "scam" and calling IRS itself "gougers" and "thieves."  *Id*. ¶¶ 71-73.  ETC has similarly amassed hundreds of complaints noting the fraudulent nature of its website.  *Id*. ¶ 80.

The tickets sold by IRS and ETC are often delivered by Defendant Verified-Ticket.  *See id.* ¶¶ 57, 60.  For example, earlier this year, a consumer purchased tickets to a Washington Wizards game through IRS's tickets-center.com website and, after paying for the ticket and IRS's fees, received a Counterfeit Ticket from Verified-

Ticket that purported to be a genuine AXS ticket. *Id.* ¶¶ 58-59. Below is this consumer's order confirmation email from IRS and the Counterfeit Ticket he received from Verified-Ticket. *Id.*

 

Verified-Ticket has similarly delivered Counterfeit Tickets purchased through ETC's website. This summer, a consumer purchased tickets to the U.S. Women's Open Golf Championship through ETC's website, received an email from ETC confirming his order, and later received a Counterfeit Ticket from Verified-Ticket, as shown below. *Id.* ¶¶ 61-62:

 

MEMORANDUM IN SUPPORT OF                    Case No. 2:24−cv−00377 CAS (Ex)
MOTION FOR PRELIMINARY INJUNCTION

1    Defendants Amosa and Secure.Tickets are similarly involved in the delivery
2  of counterfeit digital tickets.  Amosa operates the domain amosa.app as well as the
3  subdomain axs.amosa.app.   *Id*. ¶ 14. Plaintiff has seen several examples of
4  Counterfeit Tickets that consumers have presented to venues in attempt to attend
5  events that were delivered by Defendant Amosa, including tickets to an LA Clippers
6  game and other events in the Los Angeles area. *Id*. ¶ 83.  For example, a consumer
7  attempting to enter an LA Kings game in Los Angeles presented what appeared to be
8  a genuine AXS ticket, but was denied entry. *Id*. ¶ 84.  The Counterfeit Ticket has all
9  the hallmarks of a genuine AXS digital ticket, but was displayed through the
10  axs.amosa.app domain, as shown below. *Id*.:



21    Similarly, Defendant Secure.Tickets operates a digital ticket retail and/or
22  delivery service through the domain secure.tickets and through that domain has
23  delivered Counterfeit Tickets to consumers in the Los Angeles area. *Id*. ¶¶ 15, 90.
24  For example, Secure.Tickets delivered a Counterfeit Ticket to a consumer attending
25  an LA Clippers game in Los Angeles. *Id*. ¶ 90.  The digital ticket appeared to be a
26  genuine AXS digital ticket, but was displayed through the secure.tickets domain and,
27  when scanned, showed the wrong seat location and amount. *Id*.

28

MEMORANDUM IN SUPPORT OF                           Case No. 2:24−cv−00377 CAS (Ex)
MOTION FOR PRELIMINARY INJUNCTION

 

All of the Counterfeit Tickets are nearly indistinguishable from Plaintiff's genuine digital tickets.  They all include the deep, rich purple hue background and series of AXS watermarks, the phrase "AXS Mobile ID," the rotating QR code, and information about the venue, event, and purchaser contained on the face of the digital ticket that consumers would expect on a genuine AXS digital ticket.  *Id.* ¶¶ 30, 59, 62, 83, 84, 90.  AXS's Chief Technology Officer, Mr. Alex Hazboun, believes that the only way Defendants could mimic genuine AXS tickets in this way is if one or more of these Defendants have:  (i) downloaded the AXS App; (ii) bypassed AXS's access control measures to decompile, reverse engineer, disassemble or otherwise modify the AXS App or AXS SDK and ██████████████████ ████ create lookalike websites; and then (iii) created and delivered Counterfeit Tickets to these unsuspecting purchasers who think they are purchasing genuine AXS tickets.  Hazboun Decl. ¶¶ 13-14.

### E.   Additional Acts of Infringement by IRS and ETC

Not only are Defendant IRC and ETC selling and/or distributing Counterfeit Tickets, they are engaged in separate acts of trademark infringement and unfair competition.  For example, as detailed in the Verified Complaint, IRS purports to "transfer" tickets on its platform via "Flash Seats" or "AXS Mobile ID."  Compl.

¶¶ 66-70, Exh. L.  IRS even charges an $8.00 transfer fee per ticket.  *Id*. ¶ 68.  Even if IRS is selling *some* genuine AXS tickets, IRS has absolutely no part in the delivery of those tickets using "Flash Seats" or "AXS Mobile ID."  *See id.* ¶ 69.  Instead, if the tickets purchased on IRS's website are in fact genuine (which many are not), then the purchaser would receive an email from AXS instructing that purchaser to download (or log in to) the AXS App.  *Id.*  It would then be Plaintiff—not IRS—that would initiate the safe and secure transfer using the AXS Mobile ID technology.  *Id.*

For its part, ETC is engaged in the identical acts of infringement and unfair competition in this regard.  *Id.* ¶¶ 75-81.

### III.   LAW & ARGUMENT

#### A.   The Court Has Personal Jurisdiction Over Defendants

This Court has personal jurisdiction over the Defendants as set forth in detail in the Verified Complaint.  *Id*. ¶¶ 19-21.  In short, each Defendant has sold, distributed, and/or displayed Counterfeit Tickets to consumers in this district as set forth above and, by downloading, accessing, or using the AXS Platform, each Defendant has consented to personal jurisdiction in this Court.  *Id.* ¶ 20.

#### B.   AXS Is Entitled to a Preliminary Injunction

A plaintiff is entitled to preliminary injunctive relief when it shows that:  (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm in the absence of a preliminary injunction; (3) the balance of the equities tips in the plaintiff's favor; and (4) an injunction is in the public interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  As set forth herein, AXS easily satisfies each element.

##### 1.   AXS Is Likely to Succeed on Its Claims That Defendants Are Infringing Its Copyrights

To establish copyright infringement, AXS must show:  (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.  *Loomis v. Cornish*, 836 F.3d 991, 994 (9th Cir. 2016).

1

### a.   *AXS Owns Valid Copyrights to the AXS App*

Plaintiff owns two valid copyrights in the AXS App:  one relating to the iOS version, the other relating to the Android version.  Compl. ¶¶ 44-46.  The certificates of registration constitute *prima facie* evidence of the validity of the copyrights and of the facts stated in the certificates.  17 U.S.C. § 410(c).  The registrations cover both the underlying code and resulting screen displays.  *See Moement*, 2022 U.S. Dist. LEXIS 216330, at *24; *see also Merch. Transaction Sys.*, 2009 U.S. Dist. LEXIS 25663, at *29 (computer program copyrights extend to "nonliteral elements, including its structure, sequence, organization, user interface, screen displays, and menu structures").   This satisfies the first element of a claim for copyright infringement.

### b.   *Defendants Have Copied Protected Elements of AXS's Works*

Copying can be proved either by direct evidence of copying, or by showing that:  (1) the Defendants have "access" to Plaintiff's copyrighted works; and (2) Defendants' work is "substantially similar" to the Plaintiff's copyright. *Unicolors, Inc. v. Urban Outfitters*, 853 F.3d 980, 984-85 (9th Cir. 2017).  When infringing works are "strikingly similar," Defendants' "access" may be inferred. *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952-53 (9th Cir. 2019). "Striking similarity" means that "in human experience it is virtually impossible that the two works could have been independently created." *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1103 (C.D. Cal. 2005).

### c.   *The Court Can and Should Infer Access Because the Infringing Works Are "Strikingly Similar" to Plaintiff's Works*

Defendants' Counterfeit Tickets reproduce every aspect of AXS's genuine digital tickets as displayed on the AXS App, including, at least:  (1) a deep, gradient purple background;  (2) AXS watermarks throughout the background;  (3) the selection and arrangement of the QR code, transfer and sell buttons, ticket

information, and ticketholder information; and (4) the placement and use of Plaintiff's AXS Marks, including "AXS Mobile ID." Compl. ¶¶ 30, 59, 62, 83-84, 90. Indeed, Defendants' Counterfeit Tickets are nearly indistinguishable from Plaintiff's authentic tickets, as shown by the comparison below:

| Authentic AXS Ticket | Counterfeit Tickets | | | |
|---|---|---|---|---|
| | IRS and Verified-Ticket | ETC and Verified-Ticket | Amosa | Secure.Tickets |
|  |  |  |  | |

AXS's Chief Technology Officer believes that the only way Defendants can create these Counterfeit Tickets is by (i) downloading the AXS App from the Google Play Store or Apple's App Store; and then (ii) copying and/or "reverse engineering" the AXS App. Hazboun Decl. ¶¶ 13-14.

> d.    *Defendants Had the Opportunity to Copy Plaintiff's Work.*

A plaintiff may also establish "access" when the work has been widely disseminated. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000), *abrogated on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1066 (9th Cir. 2020); *see also Loomis*, 836 F.3d at 997 ("evidence of widespread dissemination centers on the degree of a work's commercial success and on its distribution through . . . relevant mediums"). The AXS Platform and AXS App easily satisfies this test.

Plaintiff's AXS App is available to the general public on the Apple App Store and the Google Play Store. To date, the AXS App has been downloaded by ▇▇▇

MEMORANDUM IN SUPPORT OF                                    Case No. 2:24−cv−00377 CAS (Ex)
MOTION FOR PRELIMINARY INJUNCTION

███████████ users.  Compl. ¶ 23.  AXS sells millions of tickets for thousands of events per year in the United States, generating ███████████████

██████████  *Id*. ¶¶ 25, 34.  Further, Plaintiff's electronic ticket delivery services have been widely disseminated through online marketing on Plaintiff's website and social media, unsolicited media attention, and through partnerships with hundreds of venues, teams and event promoters.  *Id*. ¶¶ 25, 28, 37-38.  Courts have found access on much less.  *See Kelly Tracht, LLC v. Dazzle Up, LLC*, No. 17-80434-CIV-MARRA, 2017 U.S. Dist. LEXIS 172004, at *6-7 (S.D. Fl. Oct. 18, 2017) (finding access to work based on 888 sales, and marketing on "social media and other third-party sites"); *L.A. Printex Indus. v. Aeropostale, Inc.*, 676 F.3d 841, 847 (9th Cir. 2012) (finding widespread dissemination based on 50,000 sales over four year period).  Defendants indisputably had access to AXS's work.

In sum, AXS has established that it is likely to succeed on its copyright infringement claims against Defendants.

**2.**  **AXS Is Likely to Succeed on Its Claims That Defendants Are Infringing AXS's Trademarks and Engaging in Unfair Competition**

Section 1114 of the Lanham Act provides federal causes of action for infringement and counterfeiting of federally registered trademarks.   15 U.S.C. § 1114.  Section 1125 of the Lanham Act provides federal causes of action for unfair competition.  15 U.S.C. § 1125.  Under either section, Plaintiff must show that it has valid trademark rights and that Defendants' conduct is likely to cause confusion among consumers.  *Applied Info Scis. Corp. v. eBay, Inc*., 511 F.3d 966, 969 (9th Cir. 2007).  AXS easily satisfies this burden.

*a.*  *AXS Owns Valid and Enforceable AXS Registrations*

Plaintiff owns six federally registered trademarks covering "AXS," "AXS Advantage," "AXS Anywhere," "AXS Intelligence," "AXS Insight," and "AXS Patio Sessions" (the "AXS Registrations").  Compl. ¶ 40.  These registrations are

-12-

*prima facie* evidence of Plaintiff's ownership of the marks and of their validity. *Motul S.A. v. USA Wholesale Lubricant, Inc.*, No. 4:22-cv-04841-JSW, 2023 U.S. Dist. LEXIS 138282, at *17 (N.D. Cal. Aug. 8, 2023). In addition, two of the registrations—"AXS" and "AXS Advantage"—are incontestable. Compl. ¶ 41. This is "conclusive evidence of the validity of the registered mark[s] . . . of [AXS's] ownership of the mark[s], and of [AXS's] exclusive right to use the registered mark[s] in commerce." 15 U.S.C. § 1115(b).

> b. *AXS Owns Common Law Rights in the "AXS Mobile ID" and "Flash Seats" Marks*

AXS also has common law rights to "AXS Mobile ID" and "Flash Seats." Compl. ¶ 42. Common law rights in trademarks are established by showing "either (1) that [the] mark is inherently distinctive or (2) that the mark has acquired distinctiveness through secondary meaning." *Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 977 (C.D. Cal. 2002) (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998)). Terms that are suggestive, arbitrary or fanciful are inherently distinctive. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 872 (9th Cir. 2002). Secondary meaning can be shown through "exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc. v. Asian J. Pubs., Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

The term "AXS" does not describe any characteristic, quality, or attribute of Plaintiff's digital ticket platform services, making that term inherently distinctive. *See Glow Indus.*, 252 F. Supp. 2d at 978 ("Glow" is at least suggestive and inherently distinctive because it "is not descriptive of the qualities or characteristics" of plaintiff's perfume and soap products). Further, Plaintiff has sought to register "Flash Seats" with the United States Patent and Trademark Office. Compl. ¶ 42. In both instances, the trademark examiner found that the mark was subject to

registration. *See id.* And, most recently, the examiner issued a "notice of allowance" for "Flash Seats." *Id.*, Exh. I. Thus, Plaintiff is likely to show it has valid common law rights in "AXS Mobile ID" and "Flash Seats." The AXS Registrations, "AXS Mobile ID," and "Flash Seats" are collectively referred to as the "AXS Marks."

> c. *Consumers Are Likely to Be Confused by Defendants' Improper and Unauthorized Use of the AXS Marks*

The likelihood of confusion inquiry is guided by the eight *Sleekcraft* factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). "[T]he counterfeiting of another's trademark establishes a presumption of a likelihood of confusion. . . . Courts even bypass the *Sleekcraft* test even in the case of preliminary injunctions." *AK Futures LLC v. Boyd St. Disco*, No. 8:21-cv-01027-JVS-ADSx, 2021 U.S. Dist. LEXIS 189084, at *8 (C.D. Cal. Aug. 4, 2021) (citing *Brookfield Commc'ns Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) and *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. C 12-2582 CW, 2012 U.S. Dist. LEXIS 85665, at *14 (N.D. Cal. June 20, 2012)).

> (i)    Defendants Use of Counterfeit Marks Is Inherently Confusing

Defendants are using the AXS Marks to market, sell and distribute Counterfeit Tickets that are nearly identical to Plaintiff's genuine tickets. Compl. ¶ 117. The Counterfeit Tickets include Plaintiff's AXS Marks, namely the mark "AXS," which is shown as a watermark throughout the background of both Plaintiff's genuine tickets and Defendants' Counterfeit Tickets, and the "AXS Mobile ID" mark, which is displayed above the QR code in both Plaintiff's genuine tickets and Defendants' Counterfeit Tickets. *See supra* Section III.B.1.c. As the Ninth Circuit has recently

noted, "consumer confusion is generally not in dispute in most counterfeit cases." *Arcona, Inc. v. Farmacy Beauty, Ltd. Liab. Co.*, 976 F.3d 1074, 1079 (9th Cir. 2020).

Given the striking similarity between genuine AXS tickets and the Counterfeit Tickets, there is no dispute that consumers will be confused. Even if the Court performs a full *Sleekcraft* analysis, Plaintiff is still likely to prevail.

(ii) <u>*Sleekcraft* Factor 1:  The AXS Marks Are Inherently and Commercially Strong</u>

Courts examine both the conceptual and commercial strength of the Plaintiff's marks. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011). For conceptual strength, a mark falls into one of five categories:  generic, descriptive, suggestive, arbitrary or fanciful. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999) (citation omitted). As discussed above, the AXS Marks do not describe any characteristic, quality, or attribute of Plaintiff's services and are therefore inherently strong. *See supra* Section III.B.2.b.

For commercial strength, courts look at advertising expenditures, length of exclusive use, and public recognition. *Am. Int'l Grp. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) (citation omitted). As discussed above, Plaintiff has exclusively used the AXS Marks for many years. The public has been exposed to Plaintiff's marks through Plaintiff's own marketing as well as unsolicited media attention. *See, e.g.*, Compl. ¶¶ 28, 37-38. The AXS App has been downloaded by ███████ ████████ users and AXS sells millions of tickets for thousands of events per year in the United States, generating ██████████████████████████████. *Id.* ¶¶ 23, 25, 34. This is plainly enough to establish commercial strength in the AXS Marks at the preliminary injunction stage. *See Network Automation*, 638 F.3d at 1150 (commercial strength is an "evidence-intensive inquiry" that is "unnecessary at the preliminary injunction stage"); *see also Global Tobacco, LLC v. R.K. Co.*, No. CV 15-05227-RGK (PJWx), 2015 U.S. Dist. LEXIS 190441, at *14-15 (C.D.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Case No. 2:24−cv−00377 CAS (Ex)

Cal. Sept. 24, 2015) (if a mark has acquired secondary meaning it is commercially strong). This factor favors Plaintiff.

(iii)    <u><i>Sleekcraft</i> Factor 2:  The Parties' Digital Tickets Are Identical</u>

Goods or services are related when they are complementary, sold to the same class of purchasers, or similar in use and function. *Network Automation*, 638 F.3d at 1150 (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350 (9th Cir. 1979)).  Here, Defendants are selling Counterfeit Tickets that mimic, emulate, or copy Plaintiff's genuine tickets and are clearly similar in use and function and sold to the same class of purchasers.  Indeed, Plaintiff has submitted evidence showing that Defendants have sold Counterfeit Tickets to consumers for the same events for which Plaintiff sells tickets, such as LA Kings and LA Clippers games.  Compl. ¶¶ 32, 54-55, 83-84, 90.  When, as here, the parties' goods are identical, "likelihood of confusion would follow as a matter of course." *Brookfield Commc'ns*, 174 F.3d at 1055.  The parties' goods and services are clearly related and this factor favors Plaintiff.

(iv)    <u><i>Sleekcraft</i> Factor 3:  Defendants Are Using Exact Replicas of Plaintiff's AXS Marks</u>

"The similarity of the marks is a critical question in the likelihood-of-confusion analysis." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 875 (9th Cir. 2014) (quotation marks and citation omitted).  When comparing the marks, similarities are given more weight than dissimilarities. *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).  Defendants are each using exact copies of, at least, the "AXS" and "AXS Mobile ID" marks on the face of their Counterfeit Tickets.  Compl. ¶¶ 30, 59, 62, 83-84, 90.  In addition, Defendants IRS and ETC are using Plaintiff's "Flash Seats" mark in plain text on their websites during transactions completed on their respective websites. *Id.* ¶¶ 66-70, 75-81. Defendants' use of the AXS Marks is "virtually indistinguishable" from Plaintiff's

-16-

and this factor "weighs heavily in favor of finding a likelihood of confusion." *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 825, 838 (C.D. Cal. 2018).

(v)    <u>*Sleekcraft* Factor 4:  Consumers Have Been Confused by Defendants' Counterfeit Tickets</u>

Evidence of actual confusion is not required to prove a likelihood of confusion, especially at an early stage in litigation, "because evidence of actual confusion can be difficult to obtain." *Brookfield Commc'ns*, 174 F.3d at 1050.  But Plaintiff *already* has evidence that consumers purchased tickets from Defendants and used or attempted to use them as if they were "genuine," only to discover later that they were fake.  Compl. ¶¶ 58-59, 61-62, 83-84, 90.  Plaintiff is likely to prove this factor.

(vi)    <u>*Sleekcraft* Factor 5:  The Parties Use the Same Marketing Channels and Market Their Services to the Same Consumers</u>

For this factor, "courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful Ltd. Liab. Co. v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) (citation omitted).  As discussed above, Defendants have sold tickets to LA Kings and LA Clippers games, the same events for which AXS sells tickets.  *See* Compl. ¶¶ 17, 82-83, 89.  Clearly the parties' customer bases overlap.  *See Pom Wonderful*, 775 F.3d at 1130 (the close "similarities between the products suggest an overlapping general class of consumers").  In addition, Defendants primarily or exclusively use their respective websites to advertise and market their Counterfeit Tickets, including to consumers in the Los Angeles area, and Plaintiff similarly advertises and markets its genuine tickets to consumers through its website and App.  Compl. ¶¶ 7, 11-15, 28, 37; *see Keracell, Inc. v. Aesthetically Correct, LLC*, No. 18-1793 AG (ADSx), 2018 U.S. Dist. LEXIS 223339, at *5 (C.D. Cal. Dec. 10, 2018) (granting preliminary injunction, weighing fact that "[b]oth parties use the same marketing channels— social media and online advertising—to sell their products" in favor of plaintiff). This factor favors Plaintiff.

-17-

(vii)   *Sleekcraft* Factor 6:  The Parties' Consumers Are the General Public Who Attend Events

This factor is evaluated on the care expressed by the least sophisticated relevant consumer and "low consumer care . . . increases the likelihood of confusion" whereas high consumer care reduces it.  *Playboy Enters. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004).  Plaintiff's and Defendants' consumers are any individuals who purchase tickets to sporting events, concerts, or other entertainment events. These members of the general public are not presumed to exercise any heightened level of care.  *See Rearden, LLC v. Rearden Com. Inc.*, 597 F. Supp. 2d 1006, 1025 (N.D. Cal. 2009) (general consuming public exercises lower level of care than professionals).  Further, because consumers purchase tickets from Defendants' or Plaintiff's websites, they may be less attentive to detail in their purchasing decisions given the general accessibility and familiarity of the Internet.  *See GoTo.com Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000) ("Navigating amongst web sites involves practically no effort whatsoever . . . .").  In fact, a number of the complaints about IRC and ETC show that consumers happened upon their websites, made quick purchases, and then realized they had been duped.  Compl. ¶ 72-73, 80; Exhs. M, N, O.  This factor favors Plaintiff.

(viii)   *Sleekcraft* Factor 7:  Defendants' Intent to Confuse Can Be Inferred

For this factor, courts assess "whether defendant in adopting its mark intended to capitalize on plaintiff's good will."  *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017).  Knowing adoption of a mark closely similar to one used by another is a basis for inferring intent to deceive.  *See Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993) ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public.").  Plaintiff provides notice of its trademark rights on its website and Defendants have nonetheless marketed Counterfeit Tickets bearing exact copies

-18-

of the AXS Marks.  Defendants obviously have the intent to confuse consumers.  This factor favors Plaintiff.

(ix)    <u><i>Sleekcraft</i> Factor 8:  The Parties Already Compete in the Same Market</u>

For this factor, the "question is whether the parties are likely to compete with a similar product in the same market." *Id.*  Where two companies are already in direct competition, this factor is unimportant.  *Network Automation*, 638 F.3d at 1153 (citing *Brookfield Commc'ns*, 174 F.3d at 1060).  The parties here are already in competition and market tickets to the same events, such as LA Kings and LA Clippers games.  *See supra* Section III.B.2.c.iii.

For the reasons set forth above, Plaintiff is likely to succeed on its claims of trademark counterfeiting, infringement and unfair competition.

**3.**    <u>**AXS Will Suffer Irreparable Harm in the Absence of an Injunction for Which There Is No Adequate Remedy at Law**</u>

Under the Trademark Modernization Act ("TMA"), irreparable harm is presumed upon a showing of trademark infringement.  15 U.S.C. § 1116(a), amended by H.R. REP. No. 116-645 (2020); *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1081 n.16 (N.D. Cal. 2021) (recognizing presumption of irreparable harm under TMA).  AXS has established a likelihood of success on the merits with compelling evidence.  Harm is presumed.

Indeed, the harm is overwhelming and severe for multiple reasons.  Each time a consumer buys a fake AXS ticket and gets denied entry to a venue, that consumer is likely to attribute that failure to AXS, harming Plaintiff's reputation and goodwill. *See MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1215 (C.D. Cal. 2007) (recognizing reputational harm as example of irreparable harm in copyright infringement context).

These injuries easily qualify as irreparable harm in the copyright context, where the "inability to calculate damages, harm to goodwill, diminishment of

-19-

competitive positions in marketplace . . . and lost opportunities to distribute unique products" can warrant an injunction. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004); *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 976 (C.D. Cal. 2016) ("[I]t is well-established that harm to one's reputation, goodwill, or relationships—all of which may result from future copyright infringement may constitute irreparable harm.").

### 4.   The Public Interest Is Served by an Injunction

A plaintiff seeking a preliminary injunction must demonstrate that an injunction is in the public interest. *Khast v. Wash. Mut. Bank*, No. 10-CV-2168-IEG (JMA), 2010 U.S. Dist. LEXIS 113650, at *11 (S.D. Cal. Oct. 26, 2010). The public has a "strong interest" in protecting intellectual property rights. *WeRide Corp. v. Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019). Here, the public interest weighs strongly in favor of an injunction. AXS's reputation will be protected and consumers will be protected from purchasing Counterfeit Tickets, paying unauthorized delivery fees to Defendants, and from being turned away from events for which they unknowingly purchase Counterfeit Tickets. And AXS's clients— many of whom tout the benefits of using AXS Mobile ID—will also be able to ensure that only genuine tickets are presented for admission. *See* Compl. ¶ 31,  Exh. D.

### 5.   The Balance of the Equities Favors an Injunction

As demonstrated above, AXS has suffered and will continue to suffer injury if Defendants are not immediately enjoined from their infringing conduct. *See Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028-29 (C.D. Cal. 2011) (balance of hardships favored trademark owner who would suffer harm to its goodwill and reputation absent preliminary injunction). And Defendants "cannot complain of the harm that will befall [them] when properly forced to desist from infringing activities." *Triad Sys. Corp. v. Se. Express Co*., 64 F.3d 1330, 1338 (9th Cir. 1995). Any alleged harm to Defendants is the proper loss of the unlawful advantage it

1    obtained from selling Counterfeit Tickets.  The balance of equities tips sharply in

2    Plaintiff's favor.

3              **IV.    BOND**

4              The Court has discretion over the amount of security required, if any.  *See*

5    *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quotation omitted).  And,

6    the Court "may dispense with the filing of a bond when it concludes there is no

7    realistic likelihood of harm to the defendant from enjoining his or her conduct."

8    *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen*, 320

9    F.3d at 919).  Here, because there is no likelihood of harm to Defendants from

10   enjoining their ability to illegally sell Counterfeit Tickets, the Court should require

11   AXS to post only a minimal bond or no bond at all.  *See Bridgestone Brands,*

12   *LLC v. Dastgah*, No. 16-cv-00906-BLF, 2016 U.S. Dist. LEXIS 35557, at *11 (N.D.

13   Cal. Mar. 18, 2016) (finding "minimal bond" of $500 appropriate in counterfeiting

14   case); *Samick Music Corp. v. Gordon*, No. SACV 20-395-GW-JDEx, 2020 U.S.

15   Dist. LEXIS 106485, at *34 (C.D. Cal. Mar. 26, 2020) (not requiring plaintiff to post

16   a bond in counterfeiting case).

17             **V.    CONCLUSION**

18             For the foregoing reasons, AXS respectfully requests Defendants be restrained

19   for the pendency of this action from engaging in any further acts in violation of the

20   Copyright Act and the Lanham Act as set forth in the proposed order.

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF                           Case No. 2:24−cv−00377 CAS (Ex)
MOTION FOR PRELIMINARY INJUNCTION

1

2

Dated:    January 16, 2024                          DORSEY & WHITNEY LLP

3                                                    By:  */s/ J. Michael Keyes*
                                                     J. Michael Keyes (SBN 262281)
4                                                       *keyes.mike@dorsey.com*
                                                     Connor J. Hansen (*pro hac vice*)
5                                                       *hansen.connor@dorsey.com*
                                                     Columbia Center
6                                                    701 Fifth Avenue, Suite 6100
                                                     Seattle, WA
7                                                    Telephone:  206.903.8800
                                                     Facsimile:   206.903.8820

8                                                    DORSEY & WHITNEY LLP
                                                     Kent J. Schmidt (SBN 195969)
9                                                       *schmidt.kent@dorsey.com*
                                                     600 Anton Boulevard, Suite 200
10                                                   Costa Mesa, CA 92626
                                                     Telephone:  714.800.1400
11                                                   Facsimile:   714.800.1499

12                                                   *Attorneys for Plaintiff AXS Group LLC*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-22-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff AXS Group LLC, certifies that this brief contains 6,019 words, which complies with the word limit of L.R. 11-6.1

*/s/ J. Michael Keyes*
J. Michael Keyes, SBN 262281

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Case No. 2:24−cv−00377 CAS (Ex)

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2024, a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, which shall send notification of such filing to all counsel of record. Any counsel of record who has not consented to electronic service through the Court's CM/ECF system will be served by electronic mail.

*/s/ J. Michael Keyes*
J. Michael Keyes, SBN 262281

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Case No. 2:24−cv−00377 CAS (Ex)